**In re M & L BUSINESS MACHINE COMPANY, INC., Debtor.**

**Christine J. JOBIN, Trustee of the Estate of M & L Business Machine Co., Inc., Plaintiff/Appellee/Cross–Appellant,**

v.

**Perry S. McKAY, Defendant/Appellant/Cross–Appellee.**

Civ. A. No. 93–K–1321.

United States District Court, D. Colorado.

Feb. 9, 1994.

Christine J. Jobin, Denver, CO, for plaintiff.

Joseph C. French, Craig A. Weinberg, Nicholas P. Hansen, Kirkland & Ellis, Boulder, CO, for defendant.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

In this bankruptcy appeal and cross-appeal, Perry S. McKay and Christine J. Jobin, trustee of the bankruptcy estate of M & L Business Machine Co., Inc. ("trustee"), contest the bankruptcy court's May 26, 1993 order on summary judgment, 155 B.R. 531, and its June 10, 1993 findings of fact and conclusions of law following trial on the trustee's preference and fraudulent conveyance action against McKay. In his appeal, McKay argues that the bankruptcy court erred: (1) by applying an objective standard in determining whether McKay received certain transfers in "good faith" under 11 U.S.C. § 548(c) and in concluding that McKay lacked "good faith" under that section, (2) by finding that preference actions under 11 U.S.C. § 547 are available to a trustee in a Ponzi scheme, (3) in precluding McKay from using the 11 U.S.C. § 547(c)(2) "ordinary course of business defense" to the trustee's preference claims, and (4) in failing to decide whether the trustee's claims were barred as compulsory counterclaims which should have been asserted in *Amazing Enterprises v. Jobin (In re M & L Business Machine Co.)*, 136 B.R. 271 (Bankr.D.Colo.1992). In her cross-appeal, the trustee argues that the bankruptcy court erred in finding that McKay was entitled to assert a restitution claim, the reduction of which constituted "reasonably equivalent value" under 11 U.S.C. § 548(a)(2)(A). I affirm.

### I. *Facts*

M & L Business Machines Company, Inc. ("M & L") had operated as a computer sales leasing firm since its inception in the 1970's. On October 1, 1990, it filed for Chapter 7 bankruptcy protection. Soon thereafter, it converted the case into a Chapter 11 reorganization. On December 18, 1990, Jobin was appointed Chapter 11 trustee. In February 1991, she discovered that much of M & L's boxed inventory contained bricks and dirt and suspected that M & L's principals had used the corporation as a front for a Ponzi and/or check kiting scheme. When the scheme collapsed, approximately $83,000,000 in post-dated, unpaid checks remained in the hands of various private investors, even though over $74,000,000 flowed through M & L's bank accounts from January through December, 1990.

On September 26, 1991, the trustee converted the case into Chapter 7 liquidation and has since commenced over 400 adversary proceedings to avoid transfers and recover property of the estate. The trustee filed the instant proceeding against McKay on September 30, 1992, seeking to recover $43,500 paid to McKay within ninety days of the filing of the petition under 11 U.S.C. §§ 547, 548 and 549. The facts are essentially undisputed. I adopt the findings of fact contained in the bankruptcy court's ruling on summary judgment and after trial. (*See* R.Doc. 45 at

**660**

2–4; R.Doc. 47 at 1–9.) I will review only those facts relevant to my analysis.

Between June 19, 1990 and September 10, 1990, McKay invested a total of $207,500 in M & L and received distributions totalling $43,500. At the time of each of his four investments, he was given post-dated checks which he could negotiate as the date which appeared on the check arrived. He made his initial investment of $100,000 on June 19, 1990. This was to be a two year investment generating $10,000, or ten percent per month, or an annualized return rate of 120%. He received an unsecured promissory note in exchange for this investment. He cashed three interest checks, each in the amount of $10,000, before the filing of the bankruptcy petition. McKay's second investment was for $7,500 on June 26, 1990, apparently also a two-year investment generating ten percent per month. McKay received and cashed two interest checks for this investment, each in the amount of $750. He also received an unsecured promissory note in exchange for this investment. His third investment was for $50,000 on September 7, 1990. This investment was to mature on October 5, 1990 and to pay $4000, or nine percent per week. Two interest checks cleared the bank before the bankruptcy filing. McKay's final investment was for an additional $50,000, paid in two checks of $25,000 each, on September 10, 1990. It was again structured to yield nine percent per week, although only one check in the amount of $4,000 was cashed before the filing.

The parties dispute whether McKay should have known that he was investing in a Ponzi scheme. McKay was not inexperienced in financial matters. He had three years of college at Northwestern University in Chicago, Illinois; he studied business administration and took some classes in bookkeeping. He at one time profitably operated his own construction business in California before voluntarily closing it. As a co-trustee for a family trust holding assets with a collective value in excess of $3,000,000, McKay currently operates a commercial and industrial real estate business and is familiar with a number of different financing arrangements. He personally owns a ranch operation which is customarily financed with a line of credit payable at an annualized rate of eleven percent.

When he began investing in M & L in 1990, McKay's personal portfolio included a variety of stocks and bonds, which he traded through several brokers, mutual funds, raw land and promissory notes other than those given him by M & L. McKay owns an apartment in Boulder and a residence in Ft. Lauderdale, Florida with an outstanding mortgage of approximately $44,000 on which the applicable rate of interest was ten percent per annum in 1991.

McKay learnt of M & L through Dr. Alec Tsoucatos, an economics professor, the former president of Boulder College and a long-time acquaintance, who had apparently been involved with M & L for some time. McKay testified that the main feature of his "due diligence" inquiry with respect to M & L was the recommendation of Tsoucatos. He visited the offices of M & L on one occasion and spoke with M & L representatives. In response to his inquiry, he was told that M & L could pay the high returns that it did because the investors' cash payments allowed it to obtain computer equipment at better prices than could be had otherwise so that it could undercut its competitors. He examined limited financial information regarding M & L.

The first check that McKay tried to negotiate, dated July 19, 1990, was returned by the Bank of Boulder for "uncollected funds," although the bank had initially told him that his account would be credited immediately with the funds. He spoke with a bank officer about the matter and was told that the officer would be meeting with Robert Joseph, M & L's president, that night to discuss the problem. McKay nevertheless called M & L and, in response to his message, received a return call from Joseph who informed him that the problem had been corrected. The bank itself then redeposited the check which cleared. During the summer of 1990, Tsoucatos told McKay to wait five days on each check before presenting them for payment. McKay complied and no other checks bounced.

McKay testified that he first learned of the filing of the voluntary petition on the day it

was filed, October 1, 1990, when Tsoucatos called him aside in a restaurant and first learned that fraud was involved from an article in the Denver Post in February 1990. On March 19, 1990, he filed a proof of claim in the amount of $212,250 in the M & L proceeding, which was that amount owing on the post-dated checks in his possession.

## II. *Standard of Appellate Review*

In reviewing a bankruptcy court decision, I must accept the court's findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous. Bankr.R. 8013; *Branding Iron Motel, Inc. v. Sandlian Equity, Inc. (In re Branding Iron Motel, Inc.)*, 798 F.2d 396, 399–400 (10th Cir.1986). I must also give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses. *Id.* Conclusions of law are reviewed *de novo.* *Id.*

## III. *Merits*

A. *Standard for "good faith" under 11 U.S.C. § 548(c)*

Section 548 of the Bankruptcy Code permits a trustee to avoid certain fraudulent transfers of the debtor. Here, the trustee sought to avoid the $43,500 McKay received from M & L in the year preceding bankruptcy under § 548(a)(1) and § 548(a)(2) of the Code. While unsuccessful on the § 548(a)(2) claim, she prevailed on her § 548(a)(1) claim. McKay now argues on appeal that he is nevertheless entitled to avoid liability on the § 548(a)(1) claim under § 548(c) of the Code, because he received the transfers in good faith. The parties dispute whether the standard for determining good faith is an objective or subjective one. This is an issue which I must review *de novo.*

Section 548(c) of the Bankruptcy Code provides:

Except to the extent that a transfer or obligation voidable under the section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). In its decision following trial, the bankruptcy court undertook a review of case law addressing the applicable test to measure the "good faith" requirement on the part of a transferee attempting to raise a defense under § 548(c) where a trustee seeks to avoid a fraudulent transfer under § 548(a).[1] McKay argued that a subjective test was appropriate, while the trustee argued that an objective test applies. The bankruptcy court concluded that an objective test is applicable, relying principally on *Hayes v. Palm Seedling Partners–A (In re Agricultural Research & Technology Group, Inc.)*, 916 F.2d 528, 535–36 (9th Cir.1990). In that decision, the Ninth Circuit concluded that "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint.... At least one court has held that if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *Id.,* (referring to *Sanitary Ice Vending Co. v. Harris (In re Polar Chips Int'l, Inc.)*, 18 B.R. 480 (Bankr.S.D.Fla.1982)).

McKay submits that several cases support a subjective test of "good faith" under § 548(c). None of theses cases, however, expressly addresses the issue in terms of subjective or objective tests. Rather, the cases he cites emphasize the requirement that a court should determine whether a

---

1. The bankruptcy court had earlier granted summary judgment to the trustee against McKay on the trustee's fraudulent transfer claim under 11 U.S.C. § 548(a)(1) which states:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted....

transferee acted in "good faith" on the facts of each case. McKay's reliance on *Merrill v. Abbott (In re Independent Clearing House Co.),* 77 B.R. 843, 861–62 (D.Utah 1987), is misplaced. There, the court acknowledged that, "[c]ertainly, if a defendant knew that the debtor was running a Ponzi scheme when he advanced money to the debtor or knew of the debtor's insolvency at the time of the alleged fraudulent transfer, that knowledge might indicate a lack of good faith." *Id.* However, the court further acknowledged that " 'the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment.' " *Id.* at 862 (citing 4 *Collier on Bankruptcy* ¶ 548.07[2] at 548–68 (L. King. 15th ed. 1987)). The decision does not favor either a subjective or objective test but merely states that whether a transferee acts in good faith is an issue of fact on which the bankruptcy court should take evidence. *Id.* Under this view, an inquiry into the facts of any particular case will be relevant to a determination of a transferee's "good faith", irrespective of the test chosen.

Similarly, *Practical Investment Corp. v. Rellen (In re Practical Investment Corp.),* 95 B.R. 935 (Bankr.E.D.Va.1989), does not address the "good faith" issue in terms of a subjective versus objective test. Rather, the court laid emphasis on the facts of each particular case in making such determination. *Id.* at 942–944.

In *Gilmer v. Woodson,* the Fourth Circuit determined that the rationale of the referee's conclusion of a lack of good faith was "not entirely clear" but seemed to have been that the transferee "had been a close personal friend and the regular legal counsel for the [debtors] for several years" and thus "should have known that [they] were insolvent at the time the deed of trust was given." 332 F.2d 541, 546–47 (4th Cir.), *cert. denied,* 379 U.S. 834, 85 S.Ct. 67, 13 L.Ed.2d 42 (1964). The court held that "good faith" is not lacking

unless the transferee "knowingly participated in the debtor-transferor's purpose to defeat other creditors." *Id.* While *Gilmer* apparently supports a subjective test, the basis for the court's reversal was the absence of proper subjective or objective findings of the referee to warrant his conclusion.

Although I can find no direct Tenth Circuit authority on the test for "good faith" under § 548(c), several bankruptcy court cases within the circuit expressly apply the objective standard enunciated in *In re Agricultural Research,* 916 F.2d at 535–36. *See e.g., Jobin v. Lalan (In re M & L Business Machine Co.),* 160 B.R. 851, 858 (Bankr. D.Colo.1993) ("This Court adopts the standard of 'objective' good faith rather than 'subjective' good faith."); *Jobin v. Waukau (In re M & L Business Machine Co.),* Adversary Proceeding No. 92–2683 RJB, slip op. at 2 (Bankr.D.Colo. September 1, 1993) and *Jobin v. McFadden (In re M & L Business Machine Co.),* Adversary Proceeding No. 92–2785 RJB, slip op. at 2, 1993 WL 625593 (Bankr.D.Colo. July 2, 1993).[2]

I find that the weight of authority supports the bankruptcy court's view that the "good faith" requirement under § 548(c) is to be determined by an objective, rather than subjective, test.

**B.** *Conclusion that McKay Lacked Good Faith*

McKay next argues that the bankruptcy court's finding that he lacked good faith was clearly erroneous. McKay bears the burden of proof in establishing that he received the transfers in good faith. *In re Agric. Research & Technology Group,* 916 F.2d at 535. The bankruptcy court reviewed in detail the relevant evidence, and, applying an objective test of good faith, concluded that McKay had not discharged his burden. In summary the court found that a recommendation from a commission earning friend (Tsoucatos) is at minimum a red flag and a dubious pillar on which to risk large invest-

---

**2.** McKay suggests that I should look to Colorado state law for guidance in this regard. I have reviewed the analogous Colorado fraudulent conveyance law and cannot agree that it conclusively supports a subjective, rather than objective standard. Besides, state law is irrelevant. Federal law applies.

ments and, that the explanation of the principals of M & L as to how M & L could pay rates of return ten to forty times market rates, was not plausible. These two findings coupled with the following factors led the court to its conclusion: the level of McKay's business knowledge and experience, the disparity between the prevailing market rates of return and M & L's promised rate of return, McKay's recognition of the unusual and high risk nature of the investment ... too unusual and risky for his family trust, M & L's routine use of postdated checks in loan/investment transactions, McKay's rather cursory inquiry and lack of care and due diligence in investigating an investment situation which, on its face, appeared phenomenal, and M & L's initial "bounced" investment repayment check to McKay. (*See* R.Doc. 47 at 17–18.) Giving due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses (*In re Branding Iron Motel, Inc.*, 798 F.2d at 399), I find that it's conclusion was not clearly erroneous and, accordingly, I affirm.

C. *Applicability of Preference Claims to a Ponzi Scheme*

McKay challenges the bankruptcy court's finding in its summary judgment ruling that § 547 preference claims are available to a trustee in a Ponzi scheme. On an appeal from an order granting summary judgment, I must apply the same standards as the court below, reviewing its conclusions de novo. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

McKay argues that, as a matter of public policy, all transfers in a Ponzi scheme are preferential since, from its inception, such scheme is insolvent. He cites *In re Independent Clearing House Co.*, 77 B.R. 843, 871 (D.Utah 1987) in support of this contention. While the *Independent Clearing House* court recognized the potential inequities, it found itself bound to "apply the statute as written." *Id.* McKay also relies on *American Continental Corp. v. All Preference Defendants*

*(In re American Continental Corp.)*, in which the court found that "the equities of this case require that the Preference Litigation not go forward." 142 B.R. 894, 900 (D.Ariz.1992). The court noted that the debtor's bonds were sold through branches of Lincoln Savings, which had "had the outward appearance of a legitimate operation and in certain respects, it may have been." *Id.* The court was convinced, in the circumstances of that case, that all the equities lay in favor of the bond holders and that they should all share equally in the available assets. *Id.*

In the present circumstances, even if I am not bound by the language of the statute, the equities are not clearly in favor of all private investors in the Ponzi scheme. First, not all of M & L's creditors are private investors.[3] Second, the circumstances of each private investment differ and have to be examined individually to determine where the equities lie. I therefore apply the statute as written and confirm the bankruptcy court's finding that § 547 preference claims are available to the trustee in this case.

D. *Ordinary Course of Business Exception*

McKay further challenges the bankruptcy court's summary judgment ruling that the "ordinary course of business or financial affairs" exception contained in the Bankruptcy Code 11 U.S.C. § 547(c)(2) did not apply to the facts of this case. As noted above, while I will not set aside the bankruptcy court's factual findings unless they are "clearly erroneous," I must review its conclusions of law de novo. A § 547(c)(2) determination is, however, a "peculiarly factual one" and therefore due deference is given to the decision of the bankruptcy court. *In re J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 96 B.R. 474, 476 (D.N.J.1988).

Under the Bankruptcy Code, a trustee may not avoid an otherwise preferential transfer, to the extent that the transfer was

   (A) in payment of a debt incurred by the debtor in the ordinary course of business

---

**3.** M & L's trade debt on the date of the petition in this matter totalled approximately $20,000 and its Chapter 11 administrative expenses for rent and wages will exceed $50,000. (Appellee's Appeal Br. at 31.)

or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). To except a transfer under the ordinary course of business exception, a creditor must prove all three of the stated elements. *Fidelity Savings & Inv. Co. v. New Hope Baptist,* 880 F.2d 1172, 1177 (10th Cir.1989). Moreover, the exception should be narrowly construed. *In re J.P. Fyfe, Inc. of Florida,* 96 B.R. at 476.

Several courts have held that, as a matter of law, the ordinary course of business defense is not applicable to payments received from one engaged in a Ponzi scheme, regardless of the good faith or knowledge of the transferee. *See, e.g., Henderson v. Buchanan,* 985 F.2d 1021, 1025 (9th Cir.1993); *Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214, 1219 (9th Cir.1988), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.),* 819 F.2d 214, 216–17 (9th Cir.1987); *In re Taubman,* 160 B.R. 964, 991 (Bankr.S.D.Ohio 1993). These courts have adopted the following rationale:

While "ordinary course of business" is not expressly defined in the Bankruptcy Code, it appears that the purpose of 547(c)(2) was to protect from preference ordinary trade credit transactions that are kept current, including payment of monthly utility bills. S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5874.

*In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 819 F.2d at 216–17. "Reading the ordinary course of business exception in the light of the purpose behind Section 547(c)(2), it is clear that Congress did not intend to protect one group of investors in a 'Ponzi' scheme over the rest." *Id.* at 217. "The exception applies to payments by a real business, not to payments by a fake business set up to defraud people." *Duvoisin v. Evans (In re Southern Indus. Banking Corp.),* 159 B.R. 224, 227 (Bankr.E.D.Tenn.1988).

The bankruptcy court acknowledged this line of authority but, rather than simply reject the ordinary course of business exception as inapplicable to a Ponzi scheme, it examined the facts and concluded that McKay had failed to satisfy all three requisite elements of § 547(c)(2). This is the very approach adopted by the court in *In re Independent Clearing House Co.,* one of the principal cases on which McKay relies, when it held that "[a] transfer does not fall outside the scope of section 547(c)(2) simply because it was made in furtherance of a Ponzi scheme." 77 B.R. at 875. In *In re Independent Clearing House,* the district court remanded the case, holding that the defendants would still have the burden of showing that the transfers in question met all requirements of § 547(c)(2). *Id.*

In the present case, the bankruptcy court found that McKay had failed to satisfy § 547(c)(2)(C) in that he did not show that the transfers were "made according to ordinary business terms." The court noted that the Bankruptcy Code does not qualify this element but found that, even if the practices of a particular industry are controlling, in this case, the appropriate measure of business conduct would be the practice of a business machine sales and service company. The court went on to find that, neither the promissory notes providing for usurious interest rates, nor payment by issuance of a series of post-dated checks, indicated that the transfers were "made according to the ordinary business terms" of a business machine sales and service company.

McKay argues that the bankruptcy court erred in looking to the standard practice of a business machine sales and service company since, by admission of all, including the trustee, M & L was a Ponzi scheme. McKay cites *In re Independent Clearing House Co.,* in support of his rather astonishing contention that the "ordinariness" of the transactions in the Ponzi Scheme were to be determined by comparing them with other similar fraudulent businesses. *Id.* at 874–75. However, in that very case, the court noted:

By section 547(c) Congress meant to "leave undisturbed normal financial relations [of

the debtor], because [they do] not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6329.

*Id.* at 874. Even applying a Ponzi scheme standard, the focus of the inquiry "must be directed to an analysis of the business practices which were unique to the particular parties under consideration and not to the practices which generally prevailed in the industry of the parties." *Waldschmidt v. Ranier (In re Fulghum Const. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989). Section 547(c)(2) was intended to " 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.' " *Id.* (citing *Energy Co-op., Inc. v. SOCAP Int'l, Ltd. (In re Energy Co-op., Inc.)*, 832 F.2d 997, 1004 (7th Cir.1987)). Here, all the transfers which McKay received from M & L were within the ninety-day period before the date of the filing of the petition and may be construed as "unusual action" during M & L's "slide into bankruptcy." Therefore, no past terms of business exist between M & L and McKay from which to determine if the transfers under consideration were made "in the ordinary course of business" or according to "ordinary business terms." *Id.; see also Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566–67 (11th Cir.1986).

For these reasons, I find no error in the bankruptcy court's ultimate conclusion that the transfers to McKay were out of the ordinary course of business and not according to ordinary business terms.

### E. *Compulsory Counterclaims*

McKay argues that the trustee's claims were compulsory counterclaims which should have been asserted in the prior case of *Amazing Enterprises v. Jobin (In re M & L Business Machine Co.)*, 136 B.R. 271 (Bankr.D.Colo.1992). The trustee maintains that McKay abandoned this argument in his closing argument before the bankruptcy court. McKay asserts that he requested the bankruptcy court to rule on this issue and sought leave to file a supplemental brief before the court issued its ruling. He states that leave was denied and the bankruptcy court did not rule on the issue.[4]

In *Amazing Enterprises*, McKay, as a co-plaintiff with at least forty other investors, brought an action against the trustee for a declaration that their state court claims against nondebtor third parties were not assets of the estate and that the trustee had no standing to assert such claims on the investors' behalf. The trustee brought a counterclaim asserting issues of standing to assert other claims. The bankruptcy court entered judgment in favor of the investors. On appeal, I confirmed that the trustee lacked standing to pursue the claims of McKay and other investors against the principals of M & L. *See* 160 B.R. 850, 851 (D.Colo.1993).

The Bankruptcy Rules provide that Fed. R.Civ.P. 13, relating to compulsory counterclaims, applies in adversary proceedings. Bankr.R. 7013. Rule 13 provides, in pertinent part:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed.R.Civ.P. 13(a).

McKay cites *Pullman Construction Industries, Inc. v. United States of America &*

---

4. The court is prejudiced by the fact that, although McKay designated as part of the record the transcript of closing argument conducted on May 10, 1993, the record did not include such transcript. McKay later informed the clerk of the bankruptcy court that he did not wish to have this portion of the transcript (closing argument) transcribed. "It is the appellant's duty to make certain that the record on appeal is sufficient to enable this Court to make a meaningful review of any matter urged as ground for reversal." *United States v. Quarry*, 614 F.2d 245, 246 (10th Cir.1980). However, even if McKay's argument regarding the compulsory counterclaim was not abandoned, I find it is without merit.

*Illinois Department of Revenue (In re Pullman Construction Industries, Inc.)*, 142 B.R. 280, 283–86 (Bankr.N.D.Ill.1992), where the court held that a § 547(b) preference action was a compulsory counterclaim. In *In re Pullman*, the court addressed the issue of whether a debtor's preference action to recover tax payments was a compulsory counterclaim to the government's claim to recover unpaid taxes. Relying on *Burlington Northern Railroad Company v. Strong*, 907 F.2d 707, 710–11 (7th Cir.1990), the court applied the "logical relationship" test and found that the debtor's claim arose out of the same transaction or occurrence and therefore was a compulsory counterclaim. *In re Pullman*, 142 B.R. at 283. The court in *Burlington*, however, noted that "there is no formalistic test to determine whether suits are logically related. A court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." 907 F.2d at 711–12 (footnote omitted).

*Amazing Enterprises* was a declaratory judgment action which focussed on the narrow issue of the trustee's standing to pursue the claims of several investors against the principals of M & L. The instant suit, however, contains a wide range of allegations dealing with the specific transactions between McKay and the M & L corporation and goes far beyond the discrete issue that the court in *Amazing Enterprises* was asked to decide. *See Republic Health Corp. v. Lifemark Hosp. of Florida*, 755 F.2d 1453, 1455 (11th Cir.1985). Taking into account the differing nature of the respective claims and law involved in the declaratory judgment action as opposed to the subject action, I find that the trustee's claims were not compulsory counterclaims in *Amazing Enterprises*.

**F.  *Reasonably Equivalent Value under 11 U.S.C. § 548(a)(2)***

In her cross-appeal, the trustee challenges the bankruptcy court's finding upon trial that McKay gave M & L "reasonably equivalent value" within the meaning of 11 U.S.C. § 548(a)(2). This section states in pertinent part as follows:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

.  .  .  .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation.

11 U.S.C. § 548(a)(2)(A).

"Value" is defined under § 548(d)(2)(A) as "property, or satisfaction or securing of a present or antecedent debt of the debtor." Although the term "antecedent debt" is not defined, the Bankruptcy Code defines "debt" as "liability on a claim." *Id.* § 101(12). "Claim" is defined as either a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or a right to an equitable remedy for breach of performance. *Id.* § 101(5).

To support its conclusion that McKay gave reasonably equivalent value, the bankruptcy court relied on two cases: *In re Independent Clearing House*, 77 B.R. at 857 and *Wyle v. Rider (In re United Energy Corp.)*, 944 F.2d 589, 596, n. 7 (9th Cir.1991). In *In re Independent Clearing House Co.*, which also involved a Ponzi scheme, the court reasoned that

to the extent the debtors' payments to a defendant [investor] merely repaid his principal undertaking, the payments satisfied the antecedent "debt" of the debtors, and the debtors received "value" in exchange for the transfers. Moreover, to the extent a transfer merely repaid a defendant's undertaking, the debtor received not only a "reasonably equivalent value" but the exact same value—dollar for dollar. We therefore hold that such transfers are not avoidable under section 548(a)(2).

77 B.R. at 857.

In this case, the bankruptcy court noted that, since it was undisputed that McKay invested the total sum of $207,500 in M & L and was only able to cash checks totalling $43,500, McKay effectively lost $164,000 for which he has a right to restitution. As such,

M & L had received "reasonably equivalent value" in the form of a reduction in McKay's restitution claim. The trustee could not, therefore, avoid any transfer to McKay under 11 U.S.C. § 548(a)(2) on the grounds that M & L had received "less than a reasonably equivalent value in exchange for such transfer" because of M & L's right to reduce the amount of McKay's restitution claim.

In *In re United Energy Corp.*, the Ninth Circuit held that defrauded investors in a Ponzi scheme "clearly had claims for rescission and restitution [against the debtor] which arose when they bought the [investment], regardless of whether there existed a contractual right to the return of principal." 944 F.2d 589, 596 (9th Cir.1991). Accordingly, the Ninth Circuit concluded that the defrauded investors held claims against the debtor, which claims fell within the broad definition of "debt". Further, that as investors were repaid money from the Ponzi scheme, their rights to restitution from the debtor were proportionately reduced. *Id.* at 595.

The trustee submits that the bankruptcy court overlooked the following reasoning in *In re United Energy Corp.*:

In recognizing these claims for rescission and restitution, we assume that the investors had no knowledge of the fraud the debtors were perpetrating. If investments were made with culpable knowledge, all subsequent payments made to such investors within one year of the debtors' bankruptcy would be avoidable under section 548(a)(2), regardless of the amount invested, because the debtors would not have exchanged a reasonably equivalent value for the payments. *Cf. In re Inde-*

*pendent Clearing House Co.*, 77 B.R. at 857–58.

944 F.2d at 596, n. 7. The trustee argues, on appeal, that, because the bankruptcy court found that McKay did not act in good faith under § 548(c), he cannot succeed in his restitution claim and therefore cannot defeat the trustee's claim under § 548(a)(2). I disagree.

As urged by the trustee, the bankruptcy court found that the test to be applied in determining whether McKay received the transfers from M & L "in good faith" for the purposes of § 548(c) is an objective one. The bankruptcy court further found that McKay did not receive the transfers in objective good faith. Notably, however, the bankruptcy court expressly stated:

This conclusion regarding objective "bad faith" (more accurately lack of good faith) should not be construed as a determination by the Court of malicious intent, malevolence, or nefarious scheming by McKay— or of a lack of his credibility. The court does not find he was malicious, malevolent, nefarious or not credible. He simply did not invest in M & L and receive payments from M & L in a good faith manner as measured by an objective—not subjective—standard.

(R.Doc. 47 at 18.)

The court in *In re United Energy Corp.* made the assumption that "the investors had no knowledge of the fraud that the debtors were perpetrating" when it recognized the investors claims for rescission. 944 F.2d at 596, n. 7. Here, the bankruptcy court distinguished between an objective good faith test under § 548(c) and a subjective test for the purposes of determining McKay's claim for rescission and "reasonably equivalent" value under § 548(a)(2)(A).[5] The bankruptcy court

---

**5.** After the hearing of oral argument in this case, the trustee and McKay each filed a copy of Judge Clark's Order on Motions and Cross–Motions for Summary Judgment in *Jobin v. Cervenka (In re M & L Business Machine Co.)*, Adversary Proceeding No. 92–2192 PAC, slip op., 1994 WL 131097 (Bankr.D.Colo. February 4, 1994). In that ruling, Judge Clark did not distinguish between an objective good faith test under § 548(c) and a subjective test under § 548(a)(2)(A). Without requiring an evidentiary hearing on the issue of Cervenca's good faith, the bankruptcy court concluded:

In the instant case, the payment of usurious interest coupled with the use of post-dated checks, the circumstances under which investors were enlisted in the scheme, and the caliber of those involved in peddling the investments, put Mr. Cervenka, a Doctor of Chiropractic, on notice of the fraud. That knowledge, actual or constructive is sufficient when measured by an objective standard to negate the claim that reasonably equivalent value was given in good faith.

*Id.* at 6–7 (footnote omitted).

made no finding that McKay had knowledge of the fraud, only, that he did not invest in M & L or receive payments from M & L in a good faith manner, applying an objective standard. I must accept this finding of fact by the bankruptcy court since it is not clearly erroneous. Bankr.R. 8013.

The trustee further argues that, by filing a proof of claim in March 1991 for $212,250 (the amount owing on post-dated checks in his possession), after he had obtained knowledge of the fraud in February 1990, McKay somehow waived his right to restitution and, therefore, to claim that value was given.[6] I agree with the bankruptcy court that the issue is not what McKay stated that M & L owed him but, whether, at the time he made his investments, he had a right to restitution. Applying the law as stated in *In re United Energy Corp.*, 944 F.2d at 596, the bankruptcy court correctly concluded that McKay had a right to restitution as soon as he made his investments in M & L.

Accordingly, I affirm the bankruptcy court's ruling that McKay gave M & L "reasonably equivalent value" within the meaning of 11 U.S.C. § 548(a)(2).

IV. *Conclusion*

For the reasons stated above, the bankruptcy court's judgment is AFFIRMED.

---

I disagree with the *Cervenka* court's approach in assuming, without any discussion nor reference to any authority, that the objective good faith requirement under § 548(c) is applicable to the determination of the claim for rescission and "reasonably equivalent value" under § 548(a)(2)(A).

6. The bankruptcy court, taking judicial notice of the file, noted that McKay filed an amended proof of claim in the amount of $164,000 (his total investment less amount of the M & L checks cashed by him). The bankruptcy court allowed the filing of the amended proof, applying the principle that amendments to proofs of claim should be freely permitted. *See Unioil v. Elledge (In re Unioil, Inc.)*, 962 F.2d 988, 992–93 (10th Cir.1992).