**In the Matter of Harold Ray LITTLE-TON (Chapter 7 Case 186–00980), Debtor.**

**James D. WALKER, Jr., Trustee, Plaintiff,**

v.

**Harold Ray LITTLETON, Philadelphia Savings Fund Society, and First Federal Savings and Loan Association, Defendants.**

**Adv. No. 187–0021.**

United States Bankruptcy Court, S.D. Georgia, Augusta Division.

Jan. 18, 1988.

James D. Walker, Jr., Augusta, Ga., for plaintiff.

C. Stanley Lowery, Martinez, Ga., for Littleton.

Andrew J. Kilpatrick, II, Chuck R. Pardue, Martinez, Ga., for PSFS.

William A. Trotter, III, Augusta, Ga., for FFS & LA.

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Plaintiff, acting in his capacity as Chapter 7 Trustee, has brought this adversary proceeding under Sections 548 and 550 to recover the value of an alleged fraudulent transfer. The adversary arises out of a foreclosure proceeding on the Debtor's

property. After consideration of the evidence adduced at the trial on August 26, 1987, I make the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1) The parties have stipulated to numerous facts, including that:

a) This Court has jurisdiction.

b) Harold Littleton, Debtor/Defendant, owned certain real property located at 2322 Cadden Road.

c) Philadelphia Savings Fund Society ("Philadelphia Savings") held, by assignment, a first deed to secure debt which secured a 1977 loan for $38,000.00 to purchase the property.

d) First Federal Savings and Loan Association ("First Federal") held, by assignment, a second deed to secure debt which secured a $15,305.80 loan to the Debtor.

e) On December 3, 1985, Philadelphia Savings foreclosed on its security interest in the property. Philadelphia Savings bid into the property for $34,917.09 which was the outstanding balance due on the first deed to secure debt. The foreclosure sale extinguished First Federal's second deed to secure debt upon which $15,925.48 was owed at the time of foreclosure.

f) On March 27, 1986, Philadelphia Savings sold the real property to First Federal for the sum of $35,877.89.

g) On October 8, 1986, within one year of the foreclosure sale, Harold Ray Littleton, the Debtor, filed a petition for relief under Chapter 7.

h) In August of 1987, First Federal sold the real property to Ray Dunigan for the sum of $50,000.00.

2) The testimony regarding the value of the property at the time of foreclosure is conflicting. Philadelphia Savings' appraiser, Henry B. Garrett, III, testified that the property had a fair market value of $49,-000.00 at the time of foreclosure. In contrast, the Plaintiff introduced into evidence the February 10, 1986, appraisal done by Joyce E. Thompson and Merrill L. Thompson in which they found that the property had a fair market value of $53,000.00.[1]

The Debtor testified that the property had a fair market value of $55,000.00 at the time of foreclosure. As finder of fact, I am persuaded by the Debtor's testimony and find that the fair market value of the property at the time of foreclosure was $55,000.00.[2]

The fact that Henry B. Garrett, III, neither visited nor entered the real property diminished his appraisal's credibility, and further strengthened the credibility of the Debtor's testimony.

3) In December, 1985, the Debtor was a self-employed barber who operated a barbershop which employed five barbers. The Debtor's income was approximately $2,000.00 per month. The value of the equipment at the time of foreclosure was approximately $7,000.00. The Debtor owed past-due rent, Southern Bell, $35,000.00 on the first deed to secure debt, $15,000.00 on a second deed to secure debt, and $3,000.00 on a third deed to secure debt. The barbershop was a shoestring operation with little or no cash on hand and plagued by employee turnover. The Debtor no longer operates the barbershop, and now works for others.

## CONCLUSIONS OF LAW

The issue of whether a non-judicial foreclosure sale may be set aside as a fraudu-

---

1. First Federal attached the Joyce E. Thompson and Merrill L. Thompson appraisal to its April 15, 1987, Motion for Relief from Stay. At that time, First Federal sought to stand on this appraisal in an attempt to move this Court to lift the stay. At the August 26, 1987, trial, however, First Federal introduced no evidence as to value. Rather, First Federal was content to rest on the merits, or lack thereof, of Philadelphia Savings' evidence as to value.

2. The Debtor testified: (1) He purchased the property in 1977 for $37,900.00; (2) he landscaped the property; (3) he maintained the property; (4) he felt the value of the property was approximately $60,000.00; (5) he had appraisals done based on three separate second mortgages; (6) he bases his opinion on the square footage of 1400 square feet; (7) Ray Dunigan, who purchased the real property from First Federal in August, 1987, for the sum of $50,000.00 is in the real estate business.

lent conveyance has been resolved in this jurisdiction by *Durrett v. Washington National Insurance Company*, 621 F.2d 201 (5th Cir.1980). Under former Section 67(d)(2) of the Bankruptcy Act of 1898, the Fifth Circuit held (1) that a non-judicial foreclosure sale constitutes a "transfer made" within the contemplation of the fraudulent transfer provision of the Act, and (2) that recovery of only 57.7% of the property's value was not a "fair equivalent" value for the property. The Fifth Circuit was "unable to locate a decision of any district or appellate court which had approved the transfer for less than 70% of the market value of the property". *Id.* at 203.

As a result, the pre-bankruptcy non-judicial foreclosure sale was set aside as being fraudulent. The *Durrett* progeny have had no problems in applying the *Durrett* reasoning to cases decided under Section 548 of the Bankruptcy Code. See *In re Hulm*, 738 F.2d 323 (8th Cir.1984), cert. denied, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984).

It is fair to say that *Durrett* has been heavily criticized by several well reasoned decisions. The two leading cases perhaps are *In re Madrid*, 725 F.2d 1197 (9th Cir. 1984) cert. denied, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984) and *Matter of Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985). To summarize them, these decisions find fault with *Durrett* on policy as well as legal grounds. On the policy side, they argue that *Durrett* is an unwarranted interference with state real property laws and that creating a "defacto right of redemption" under federal bankruptcy law will do nothing but chill participation at foreclosure sales and further suppress the likely purchase prices obtained at them. *Madrid,* at 1202; *Winshall,* at 1139.

On the legal side these cases have held that there was no "transfer made" at the time of the foreclosure sale. Rather, the transfer, for purposes of fraudulent conveyance analysis occurred when the mortgage or debt deed was perfected under state law. *Madrid,* at 1200; *Winshall,* at 1138. Both cases point out that the definition of what constitutes a transfer adopted by *Durrett* was the general definition found in Section 1(30) of the former Bankruptcy Act, now codified as 11 U.S.C. Section 101(50). According to *Madrid* and *Winshall,* however, what *Durrett* overlooked was that even accepting the proposition that a foreclosure sale constituted a "transfer" in the general sense, the transfer was not "made" for the purposes of 11 U.S.C. Section 548 at the time of the non-judicial sale but at the time of perfection as set forth in 11 U.S.C. Section 548(d), formerly Section 67(d)(5) of the Bankruptcy Act.[3]

This distinction is not purely academic. In *Durrett, Madrid* and the case at bar, the perfection of the debt deed occurred long before the one year proscribed period, whereas the foreclosure sale was within the one year period of Section 548. Thus, the determination of when the transfer occurred is critical.

*Durrett* has also been criticized within its own Circuit. *Abramson v. Lakewood Bank and Trust Co.,* 647 F.2d 547 (5th Cir.1981), cert. denied, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). There, the court reaffirmed its holding in *Durrett* and voided a foreclosure sale that occurred within one year of bankruptcy when the deed of trust was perfected prior to the one

**3.** It should be noted that both 11 U.S.C. Section 101(50) and 548(a) have been amended by the 1986 amendments to the Code. Legislative history, however, reveals that Congress expressly intended neither approval or rejection of *Durrett* or *Madrid* in adopting the changes. But see *In re Verna,* 58 B.R. 246 (Bankr.C.D.Cal.1986). Even accepting the analysis in *Verna* that the 1984 amendments should be taken as affirming the ruling in *Durrett* that a foreclosure constitutes a transfer, section 548(d) still establishes a rule that the transfer by foreclosure is "made"

for purposes of fraudulent conveyance analysis within one year of the bankruptcy filing if within that one year period a bona fide purchaser could have purchased the debtor's equity of redemption and held such equity "superior to the interest in such property of the transferee". In this context "transferee" means the holder of the deed to secure debt and under Georgia law no bona fide purchaser could purchase any rights in debtor's property which would be superior to a previously perfected debt deed. See generally, O.C.G.A. § 44–14–63; § 44–2–1.

year period. The dissenting opinion, however, characterized *Durrett* as "simply wrong". *Id.* at 549. The dissent focused upon the fact that a foreclosure sale is not a transfer *by the debtor* under Section 67(d) [or presumably 11 U.S.C. Section 548(a)] rather than the approach in *Madrid,* or *Winshall,* but would have adopted their result if it had not been "bound" by *Durrett.*

■ After an analysis of these authorities, were I free to rule on this question as a case of first impression, I would follow *Madrid* and *Winshall* and hold that the foreclosure sale conducted within one year of the filing of this case may not be set aside as fraudulent if the debt deed was recorded more than one year prior to the filing of the bankruptcy case. However, I feel bound, as did the dissent in *Abramson* to follow the *Durrett* rule, unless and until the Court of Appeals for this Circuit announces a different rule. Accordingly, I conclude that the foreclosure sale may be set aside as fraudulent if the other requirements of Section 548 are met.

In this regard, the only issues which remain to be resolved by this Court are whether the Debtor: (1) "Received less than a reasonably equivalent value in exchange for such transfer ..." Section 548(a)(2)(A); and (2) "was insolvent on the date that such transfer was made ... or became insolvent as the result of such transfer ..." Section 548(a)(2)(B)(i).

■ In determining whether the Debtor received a reasonably "equivalent value" as a result of the foreclosure sale, the *Durrett* 70% guideline is helpful. The Debtor's property was sold at the foreclosure sale for $34,917.09 or 63.49% of the fair market value of the property. The

foreclosure sale price bid in by the first deed to secure debt holder failed to capture $20,082.91 of value which existed in the property at the time of foreclosure. Based on the guidelines set forth in *Durrett,* I conclude that Philadelphia Savings did not pay the "reasonably equivalent value" as required by Section 548(a)(2)(A). While a 70% rule may seem arbitrary or mechanical, if *Durrett* is the law, a certain, fixed standard is to be preferred to one which leaves the question of what is "reasonably equivalent value" to a case-by-case analysis.

Whether the Debtor was insolvent on the date of the foreclosure sale is answered by applying Code Section 101(31) to the facts at hand. Code Section 101(31) defines "insolvent" in terms of a balance sheet test. The burden is on the Trustee to prove that at the time of the foreclosure that the Debtor's liabilities exceeded his assets, at fair evaluation, exclusive of his allowable exemptions under Code Section 522. Code Section 101(31). At the time of foreclosure the Debtor had a total of $54,933.00 in liabilities, and non-exempt assets of $56,800.00.[4] As a result of the foreclosure, he lost an asset worth $55,000.00 and had $34,917.09 in debt extinguished, leaving him with debts of $20,015.91 and non-exempt assets of only $1,800.00. In light of the evidence presented, I find that the Trustee has satisfied his burden of proving insolvency under 11 U.S.C. Section 548(a)(2)(B)(i). Accordingly, I hold that the Trustee has carried his burden in proving that the December 3, 1985, foreclosure sale was a fraudulent transfer within the contemplation of Code Section 548.

■ Philadelphia Savings, however, may arguably fall within the saving provision of

---

**4.** The Debtor testified that in December, 1985, he had an income of approximately $2,000.00 per month before expenses, but that after expenses he was in the "hole". The Debtor further testified that his other assets including his barber shop had a fair valuation of $10,000.00. In addition, I have determined that the fair market value of the Debtor's property at the time of foreclosure was $55,000.00. The property was subject to three mortgages: A first deed to se-

cure debt in the amount of $35,000.00; a second deed to secure debt in the amount of $15,000.00; and a third deed to secure debt in the amount of $3,000.00. In addition to the debt owed on the property, the Debtor testified that he owed Krouse $1,900.00 and Southern Bell $33.00 at the time of foreclosure. Finally, the Debtor's Schedule B-4 exemptions show $8,200.00 in property claimed as exempt.

Code Section 548(c). This section provides in part:

"A transferee ... that takes for value and in good faith has a lien on or may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange for such transfer ..." Section 548(c).

A transferee must prove that he takes for "value" and in "good faith" to fall within this provision. It is obvious that Philadelphia Savings' payment of $34,917.09 bid in at the foreclosure sale constitutes "value" as defined in Code Section 548(d)(2)(A).[5]

It is not so clear, however, that Philadelphia Savings has taken in "good faith". "Knowledge of the transferor's insolvency may, in conjunction with other factors, prevent the transferee from asserting good faith. Indeed, the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment." 4 *Collier on Bankruptcy*, ¶ 548.07 at 548–68 (15th ed. supp. Aug.1986). It is obvious that a creditor who is the holder of a first deed to secure debt who initiates a foreclosure proceeding, is aware of or at the very least should be aware of the financial condition of the debtor. In any event, Philadelphia Savings' actual knowledge of the Debtor's insolvency or the knowledge it would have obtained if it had made a reasonable investigation into the Debtor's financial condition is sufficient to preclude a finding of good faith on Philadelphia Savings' behalf. See: *Kidder Skis Intern v. Williams*, 60 B.R. 808 (W.D.Mo.1985) (A transferee who has a closer financial relationship with the debtor than other creditors and, also, knew that the debtor was in financial trouble did not take in good faith); *In re Health Gourmet, Inc.*, 29 B.R. 673 (Bankr.D.Mass.1983) (Lender's knowledge of a debtor's insolvency prohibits a finding that he is a good faith transferee); *In re Polar Chips International, Inc.*, 18 B.R. 480 (Bankr.S.D.Fla.1982) (If the circumstances of the conveyance are such as to put an ordinarily prudent man on inquiry as to the fraudulent purposes of the debtor, and if a diligent inquiry would have discovered the fraudulent purpose, and the transferee fails to make such an inquiry, the transfer is fraudulent). For all the foregoing reasons, I hold that the safe harbor provisions of Code Section 548(c) are unavailable to Philadelphia Savings.

Code Section 550(a) sets forth the liability of the transferee of the avoid transfer.

"The trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) The initial transferee of such transfer ...; or

(2) any immediate or mediate transferee of such initial transferee."

Immediate transferees, like First Federal, receive certain protections from recovery under Code Section 550(b). First Federal, however, loses the protections otherwise afforded by Code Section 550(b) because it has failed, as did Philadelphia Savings, to take in good faith.[6] Either Philadelphia Savings or First Federal could have protected itself from liability being imposed upon it under Code Section 550 by paying the reasonably equivalent value for the property. Neither Defendant, however, chose to do this.

Under Code Section 550(c) the trustee is entitled to only a single satisfaction. The

---

**5.** Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor".

**6.** First Federal is the holder of a second deed to secure debt. Like Philadelphia Savings, First Federal either knew or should have known of the Debtor's financial difficulties at the time of the foreclosure sale. Such knowledge or failure to obtain such knowledge in light of the surrounding circumstances which would put an ordinarily prudent man on inquiry preclude a finding of good faith. As such, Code Section 550 allows the Trustee to recover from either Philadelphia Savings, the initial transferee, or First Federal, the immediate transferee.

Trustee shall be awarded the difference between the foreclosure sale price and the fair market value of the property at the time of foreclosure. *In re Hulm,* 45 B.R. 523, 529 (Bankr.D.N.D.1984).

### ORDER

For the foregoing reasons, IT IS THE ORDER OF THIS COURT that judgment be entered in favor of the Trustee and against Philadelphia Savings Fund Society and First Federal Savings and Loan Association in the sum of $20,082.91.