84 F.3d 1330
 64 USLW 2768, 36 Collier Bankr.Cas.2d 996,
29 Bankr.Ct.Dec. 188,
13 Colo. Bankr. Ct. Rep. 210
 In re M & L BUSINESS MACHINE COMPANY, INC., Debtor.
Christine J. JOBIN, Trustee of the Estate of M & L Business
Machine Company, Inc., Plaintiff-Appellee/Cross-Appellant,
v.
Perry S. McKAY, Defendant-Appellant/ Cross-Appellee.
 Nos. 94-1087, 94-1097.
 United States Court of Appeals,
Tenth Circuit.
 May 29, 1996.
Rehearing Denied in No. 94-1087
July 16, 1996.
 
 Craig A. Weinberg (Andrew C. Littman, with him on the briefs), Stevens, Littman & Biddinson, Boulder, Colorado, for Defendant-Appellant.
 Christine J. Jobin (Dana M. Arvin and Charles F. McVay with her on the briefs), The Jobin Law Firm, Denver, Colorado, for Plaintiff-Appellee.
 Before KELLY, SETH*, and HENRY, Circuit Judges.
 HENRY, Circuit Judge.
 
 
 1
 This appeal concerns the investments made by the appellant Perry S. McKay in a pyramid or "Ponzi" scheme run by the debtor in bankruptcy, M & L Business Machine Company, Inc. ("M & L"). The appellee Christine J. Jobin, the bankruptcy trustee for M & L, brought an adversary proceeding against Mr. McKay seeking to recover a total of $43,500 in payments made to him in the ninety day period preceding the filing of the bankruptcy petition. Ms. Jobin argued that, under the Bankruptcy Code, the $43,500 paid to Mr. McKay was avoidable for several reasons and that the money should be returned to the bankruptcy estate for distribution to all creditors. In response, Mr. McKay argued that the payments constituted returns of a good faith investment for which M & L obtained reasonably equivalent value, that the payments were made in the ordinary course of business, and that, as a result, the trustee was not entitled to recover them.
 
 
 2
 After the resolution of cross-motions for summary judgment and a trial, the bankruptcy court concluded that the trustee was entitled to recover $22,000.00 from Mr. McKay under 11 U.S.C. § 547(b), which authorizes the avoidance of transfers through which a transferee obtains more than he or she would have received in a chapter 7 liquidation proceeding. The court also held that the trustee was entitled to recover the entire $43,500 from Mr. McKay under 11 U.S.C. § 548(a)(1) as transfers made with the intent to hinder or defraud creditors. However, the court rejected the trustee's claim under 11 U.S.C. § 548(a)(2), which concerns transfers for which the debtor receives less than reasonably equivalent value. The effect of the bankruptcy court's rulings was a $22,000 judgment in favor of the trustee on the § 547(b) claim, and a judgment of $43,500 in favor of the trustee on the § 548(a)(1) claim. The district court affirmed the bankruptcy court's decision in all respects. See Jobin v. McKay (In re M & L Business Mach. Co., 164 B.R. 657 (D.Colo.1994)).
 
 
 3
 Mr. McKay now challenges the district court's affirmance of the bankruptcy court's entry of judgment in favor of the trustee on her § 547(b) and § 548(a)(1) claims. In her cross-appeal, the trustee contends that the bankruptcy and district courts erred in rejecting her claim under § 548(a)(2). For the reasons set forth below, we affirm the decision of the district court.
 
 I. BACKGROUND
 
 4
 In the mid-1980s, officers of the debtor M & L began running a Ponzi scheme.[1] Using the company's legitimate operations as a computer sales and leasing company as a front, the M & L officers solicited investments by promising extremely high rates of return. Upon receiving money from investors, M & L issued promissory notes and paid the promised sums with postdated checks drawn on company accounts.
 
 
 5
 From June through September 1990, Mr. McKay invested a total of $207,500 in M & L on varying terms. He made an initial investment of $100,000 on June 19, 1990, receiving an unsecured promissory note offering a return of ten percent per month ($10,000) over a two year period. A week later, he invested an additional $7,500 on the same terms. Finally, on September 7, 1990, and again on September 10, 1990, Mr. McKay invested $50,000 in M & L. On the latter two investments, M & L promised Mr. McKay a return of nine percent per week ($4,000). At the time of each of his investments, Mr. McKay received postdated checks. He deposited nine of them, totaling $43,500.
 
 
 6
 On October 1, 1990, M & L filed a petition under chapter 7 of the Bankruptcy Code. The bankruptcy court converted the case to chapter 11 and appointed Ms. Jobin as trustee. After the Ponzi scheme was discovered, the trustee converted the case back to chapter 7 and filed adversary proceedings against M & L investors in which she sought to recover payments made by M & L prior to the bankruptcy petition. She filed the instant adversary proceeding against Mr. McKay in September 1992 and asserted claims to recover the $43,500 under the preference, fraudulent transfer, and post-petition transaction provisions of the Bankruptcy Code. See 11 U.S.C. §§ 547, 548, and 549.
 
 
 7
 Mr. McKay and the trustee filed motions for summary judgment, which the bankruptcy court granted in part and denied in part. The court ruled that the trustee was entitled to recover $22,000 from Mr. McKay as an avoidable preference under 11 U.S.C. 547(b).[2] The court rejected Mr. McKay's argument that the transfers from M & L had been made "in the ordinary course of business" and therefore were not subject to avoidance in light of § 547(c)(2). Additionally, the court found that although the trustee had established the elements of an avoidable transfer "to hinder, delay, or defraud" creditors under § 548(a)(1), there were controverted issues of material fact as to whether Mr. McKay had received the payments from M & L "in good faith," as that term is used in § 548(c), such that he could defeat the § 548(a)(1) claim. Finally, the court concluded that there were unresolved factual issues as to whether M & L had received "reasonably equivalent value" for the transfers to Mr. McKay and that, as a result, summary judgment was also not warranted on the trustee's claim to avoid the transfers under § 548(a)(2).
 
 
 8
 After denying summary judgment on the § 548(a)(1) and 548(a)(2) claims, the bankruptcy court heard evidence concerning the circumstances surrounding Mr. McKay's investments in M & L. The evidence established that Mr. McKay had substantial experience in financial matters. In particular, he studied business administration in college and operated a profitable construction business in California. At the time of the bankruptcy proceedings, Mr. McKay was the co-trustee of a family trust holding over $3,000,000 in assets. He operated an industrial park in Golden, Colorado, a commercial real estate business, and a farming and ranching business. When he began investing in M & L, Mr. McKay's portfolio included stocks and bonds--which he traded through several brokers--mutual funds, land, and promissory notes. He subscribed to several investment publications.
 
 
 9
 Mr. McKay testified that he learned of M & L though Dr. Alec Tsoucatos, an economics professor and former college president who informed him of the extremely high rates of return that M & L was offering and reported that he had profitably invested in M & L over the last five years. Mr. McKay acknowledged that shortly after his first payment to M & L, he learned that Dr. Tsoucatos, although not representing himself to be a broker, had received a commission for convincing him to invest.
 
 
 10
 After speaking with Dr. Tsoucatos, Mr. McKay visited M & L's corporate offices and spoke with two of its officers. In response to his inquiries about M & L's offering such high rates of return, the M & L officers stated that investors' cash payments allowed the company to obtain computer equipment at very low prices and then negotiate extremely profitable contracts with its customers. The officers reported that M & L had obtained contracts to provide equipment to a California school district and to several Fortune 500 companies. However, they said, concerns about confidentiality precluded them from disclosing the terms of specific contracts. The M & L officers also informed Mr. McKay that the company's use of private investors to provide financing allowed them to negotiate contracts more quickly, without the constraints imposed by conventional lenders. However, the officers also stated that the majority of their financing was obtained through conventional lenders.
 
 
 11
 Mr. McKay also testified to the bankruptcy court that, before investing in M & L, he reviewed audited financial statements (for 1988, 1989, and part of 1990) that M & L officers provided. He also reviewed sales projections for 1990 and biographical sketches of two of M & L's officers. The sketches indicated that neither officer had significant financial experience. Additionally, Mr. McKay did not attempt to verify any of the information in the financial statements. He neither examined any of the purported contracts with M & L customers nor attempted to contact any of the conventional lenders that the M & L officers had reported to be the source of most of the company's financing.
 
 
 12
 In his testimony before the bankruptcy court, Mr. McKay acknowledged that the first check that he received from M & L was returned for uncollected funds. After receiving notice of the returned check, Mr. McKay contacted a bank officer, who informed him that the matter would be discussed with M & L's president. Subsequently, Mr. McKay spoke to M & L's president, who assured him that the problem had been corrected. The check cleared after it was deposited a second time. Dr. Tsoucatos then advised Mr. McKay not to deposit M & L's checks until five days after the date on each check. Mr. McKay followed this advice and had no further difficulty in depositing M & L's checks.
 
 
 13
 During the bankruptcy proceedings, the trustee also introduced testimony from Mr. Ken Wester, a goldsmith and gemologist who had been solicited to invest in M & L but had declined. Mr. Wester had considerably less financial experience than Mr. McKay, but he explained that he refused to invest because he was suspicious of the extremely high rates of return.
 
 
 14
 After hearing the evidence, the bankruptcy court issued findings of fact and conclusions of law. The court ruled that Mr. McKay had failed to demonstrate that the transfers from M & L were taken in good faith under § 548(c). As a result, it found that the trustee was entitled to avoid all of the challenged transfers under § 548(a)(1), but not under § 548(a)(2). With regard to the § 548(a)(2) claim, the court reasoned that because M & L had received reasonably equivalent value for its payments to Mr. McKay, judgment should be entered in favor of Mr. McKay.
 
 
 15
 The district court affirmed the bankruptcy court's summary judgment rulings, findings of fact, and conclusions of law in all respects. See Jobin, 164 B.R. at 661-668. On appeal to this court, Mr. McKay advances the following arguments: (1) that the bankruptcy and district courts erred in applying an objective standard of good faith under § 548(c); (2) that even under an objective standard, the evidence presented to the bankruptcy court established that he received the payments from M & L in good faith; and (3) that the courts erred in concluding that the transfers from M & L were not made in the ordinary course of business under § 547(c)(2). In her cross appeal, the trustee argues that the courts erred in rejecting her claim to avoid the transfers under § 548(a)(2).
 
 II. DISCUSSION
 
 16
 A. The objective standard for determining good faith is
 
 
 17
 proper under 11 U.S.C. § 548(c).
 
 
 18
 Mr. McKay first argues that the bankruptcy and district courts erred in concluding that he did not receive the transfers from M & L in good faith and in thereby rejecting his defense to the trustee's § 548 claims. He maintains that both courts erroneously applied an objective standard of good faith, under which "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." Jobin, 164 B.R. at 661 (quoting Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Technology Group, Inc.), 916 F.2d 528, 536 (9th Cir.1990)). According to Mr. McKay, the proper measure of good faith under § 548(c) is subjective--"a transferee does not lack 'good faith' unless he has some actual knowledge of the fraud." Aplt. Brief at 26. This argument raises a legal question regarding the proper interpretation of the Bankruptcy Code and is therefore subject to de novo review. See Dalton Dev. Project v. Unsecured Creditors Comm. (In re Unioil), 948 F.2d 678, 681 (10th Cir.1991) (Although "[a] bankruptcy court's factual determinations will not be disturbed on appeal absent the most cogent reasons appearing in the record," conclusions of law may be reviewed de novo. (internal quotation and citation omitted)).
 
 
 19
 We begin our analysis with the language of the Bankruptcy Code. Section 548(a)(1) provides that the trustee may avoid transfers of the debtor's property made within one year before the filing of the bankruptcy petition if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became ... indebted." Section 548(a)(2) authorizes the trustee to avoid transfers on somewhat different grounds. If the debtor "received less than reasonably equivalent value" in exchange for a transfer of the debtor's property, the trustee may avoid the transfer if several additional elements are established. 11 U.S.C. § 548(a)(2).[3]
 
 
 20
 Section 548(c) provides a defense for individuals to whom the debtor's property is transferred:
 
 
 21
 Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
 
 
 22
 11 U.S.C. § 548(c) (emphasis supplied).
 
 
 23
 As the parties note, the Bankruptcy Code does not define "good faith." "Likewise, the legislative history related to section 548(c) never defines, and scarcely addresses, good faith." In re Telesphere Communications, Inc., 179 B.R. 544, 557 n. 20. (Bankr.N.D.Ill.1994) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 89-90 (1978), H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977)). As a result, courts applying § 548(c) have generally refused to formulate precise definitions. See, e.g., In re Agric. Research & Technology Group, 916 F.2d at 536 ("Courts have been candid in acknowledging that good faith 'is not susceptible of precise definition.' ") (quoting Consove v. Cohen (In re Roco Corp.), 701 F.2d 978, 984 (1st Cir.1983)); In re Telesphere, 179 B.R. at 557 (noting that "there is no clear source of interpretive guidance" in construing the term). In analyzing § 548(c), one leading commentator has concluded that "[t]he unpredictable circumstances in which the courts may find its presence or absence render any definition of 'good faith' inadequate, if not unwise." 4 Collier on Bankruptcy p 548.07 at 548-72 (Lawrence P. King ed., 15th ed.1996).
 
 
 24
 Nevertheless, contrary to Mr. McKay's contention, "good faith" has frequently been construed to include an objective component. After noting that "[g]ood faith is an intangible and abstract quantity with no technical meaning," Black's Law Dictionary states that the term includes not only "honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage" but also "freedom from knowledge of circumstances which ought to put the holder on inquiry." Black's Law Dictionary at 693 (6th ed.1990) (emphasis supplied). Prominent bankruptcy scholars agree: "[T]he presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment." 4 Collier on Bankruptcy, supra, p 548.07 at 548-73.
 
 
 25
 The Eighth Circuit has recently followed this objective approach in determining good faith under § 548(c), holding that "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." See Brown v. Third Nat. Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir.1995) (citing Armstrong v. Ketterling (In re Anchorage Marina, Inc.), 93 B.R. 686, 693 (Bankr.D.N.D.1988); 4 Collier on Bankruptcy, supra, p 548.07 at 548-72 to 73). The Sherman court concluded that the transferee's knowledge of the debtors' substantial debts, of their delinquent mortgage payments, of a bank's plan to file foreclosure proceedings against them, and of a pending lawsuit placed the transferee on inquiry notice that the transfer of the debtors' property was not made in good faith under § 548(c). 67 F.3d at 1355-56. Similarly, in In re Agric. Research & Technology Group, the Ninth Circuit relied on several Supreme Court decisions construing "good faith" in other contexts to conclude that "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint."[4] Significantly, the majority of bankruptcy courts construing "good faith," as it is used in § 548(c), have followed the Eighth and Ninth Circuits, holding that a transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to the § 548(c) good faith defense. See, e.g., In re Anchorage Marina, 93 B.R. at 693; Walker v. Littleton (In re Littleton), 82 B.R. 640, 644 (Bankr.S.D.Ga.1988), rev'd on other grounds, 888 F.2d 90 (11th Cir.1989); Williams v. Kidder Skis Int'l (In re Fitzpatrick), 73 B.R. 655, 658 (Bankr.W.D.Mo.), aff'd in part and rev'd in part, 60 B.R. 808 (W.D.Mo.1985); In re Polar Chips Int'l, 18 B.R. at 484.
 
 
 26
 In arguing that these decisions should not be followed and that good faith should be measured subjectively, Mr. McKay invokes this circuit's decision in Richards v. Platte Valley Bank, 866 F.2d 1576 (10th Cir.1989), two Fourth Circuit decisions, the analysis of several bankruptcy courts, and the definitions of good faith under the Uniform Commercial Code and various state laws concerning fraudulent conveyances. However, none of these authorities establishes that the objective measure of good faith applied by the bankruptcy and district courts is improper.
 
 
 27
 In Richards, we construed a provision of Colorado's version of the Uniform Fiduciaries Act, Colo.Rev.Stat. § 15-1-109, that imposed liability on banks paying checks written by fiduciaries when "paying the check amounts to bad faith." Richards, 866 F.2d at 1579 n. 2 (quoting Colo.Rev.Stat. § 15-1-109). We observed that although the statute did not define "bad faith," it defined good faith as "a thing done 'honestly, whether it be done negligently or not.' " Id. at 1582 (quoting Uniform Fiduciaries Act, § 1(2), 7A U.L.A. 396 (1985)). We considered that definition in concluding that, under the Colorado statute, the mere failure to make inquiry, even though there are suspicious circumstances, does not constitute bad faith--"unless the facts and circumstances are so cogent and obvious that to remain passive would amount to deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." Id. at 1583 (citations omitted).
 
 
 28
 Richards clearly does not address the circumstances now before us in this adversary proceeding under the Bankruptcy Code. As noted above, unlike the Uniform Fiduciaries Act, § 548(c) of the Bankruptcy Code does not define good faith in terms of knowledge and does not expressly exclude consideration of negligence. Moreover, the Richards decision is based in part on consideration of the purpose of the Uniform Fiduciary Act--the need for uniform rules "to take the place of diverse and conflicting rules that had grown up concerning constructive notice of breach of fiduciary obligations in order that commerce might proceed with as little hindrance as possible." Id. (quoting Union Bank & Trust Co. v. Girard Trust Co., 307 Pa. 488, 161 A. 865, 870 (1932)). In the instant case--in which a bankruptcy trustee seeks to recover assets for the benefit of all creditors of a Ponzi scheme--the need for a good faith standard that removes hindrances to commerce is not the paramount concern that it was in Richards. See Gill v. Winn (In re Perma Pac. Properties, Inc.), 983 F.2d 964, 968 (10th Cir.1992) ("It is the ultimate aim of the preference law in the Bankruptcy Code to insure that all creditors receive an equal distribution from the available assets of the debtor.").
 
 
 29
 As to the other authorities on which Mr. McKay relies, we agree with the district court that none of them expressly addresses the issue of whether the determination of good faith under § 548(c) has an objective component. See Jobin, 164 B.R. at 661-62. Smith v. Mixon, 788 F.2d 229 (4th Cir.1986), the more recent of the Fourth Circuit cases that Mr. McKay cites, interprets a provision of the Bankruptcy Code, 11 U.S.C. § 550(b)(1), which establishes a defense to a trustee's avoidance actions under 11 U.S.C. § 550(a)(2) for "any immediate or mediate transferee of such initial transferee." Section 550(b)(1) provides that the trustee may not recover from these transferees if they "take for value ... in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1) (emphasis supplied). In construing this section, the Smith court focused on the use of the term "knowledge" and concluded that that term referred to actual notice and not constructive notice. Smith, 788 F.2d at 232. In this case, because Mr. McKay received the disputed funds directly from the debtor, M & L, he was not an "immediate or mediate transferee of [an] initial transferee," 11 U.S.C. § 550(b)(1). The reasoning of Smith is therefore inapplicable.
 
 
 30
 The earlier Fourth Circuit decision on which Mr. McKay relies, Gilmer v. Woodson, 332 F.2d 541 (4th Cir.), cert. denied, 379 U.S. 834, 85 S.Ct. 67, 13 L.Ed.2d 42 (1964), is also based on a statute not at issue here--section 67(d)(2) of the Bankruptcy Act. Construing that section, the Gilmer court stated that "good faith cannot be said to be lacking unless the transferee knowingly participated in the debtor-transferor's purpose to defeat other creditors or lacked good faith in valuing the property exchanged." Gilmer, 332 F.2d at 547. However, the court did not expressly hold that good faith must always be subjectively measured under section 67(d) of the Bankruptcy Act. Moreover, in reversing the district court's finding of a lack of good faith, the Gilmer court considered several objective factors--the value of the antecedent debt and the value of the security received. See id. Therefore, Gilmer also does not establish that good faith under § 548(c) must be measured subjectively.
 
 
 31
 As to the decisions of bankruptcy courts, Mr. McKay relies primarily on Merrill v. Abbott (In re Indep. Clearing House Co.), 77 B.R. 843 (D.Utah 1987), and Practical Inv. Corp. v. Rellen (In re Practical Inv. Corp.), 95 B.R. 935 (Bankr.E.D.Va.1989). However, as the district court noted, neither case held that good faith under § 548(c) must always be measured subjectively. In particular, although at one point the Independent Clearing House court referred to good faith as "a subjective question," 77 B.R. at 862, the court also noted that the presence of circumstances placing the transferee on inquiry as to the debtor's insolvency may deprive him of the good faith defense, id. (citing 4 Collier on Bankruptcy, supra, p 548.07 at 548- ). Moreover, the Independent Clearing House court explained (albeit in a mixed anatomical metaphor) the determination of good faith in a manner that emphasized objective factors: "The test is whether the transaction in question bears the earmarks of an arm's length bargain." Id. Similarly, in In re Practical Investment, the court focused on the particular facts before it in concluding that a transferee was entitled to the good faith defense and did not expressly hold that a subjective test was required. 95 B.R. at 942-45.
 
 
 32
 Finally, we are not persuaded by Mr. McKay's argument that the definitions of good faith under the Uniform Commercial Code and state fraudulent conveyance laws should be adopted in interpreting § 548(c). Many of these provisions contain language different than the language used in § 548(c) and, like the Uniform Fiduciaries Act, which we considered in Richards, 866 F.2d at 1583, involve policy concerns not applicable here. See, e.g., Territorial Sav. & Loan Ass'n v. Baird, 781 P.2d 452, 461 (Utah App.1989) (referring to the definition of "good faith" set forth in Utah Code Ann. § 70A-1-201(19) (1989)--"honesty in fact in the conduct or transaction concerned"); Money Mart Check Cashing Ctr., Inc. v. Epicycle Corp. 667 P.2d 1372, 1373 (Colo.1983) (noting that "[t]he drafters of the Uniform Commercial Code intended that this standard [of good faith] be a subjective one"). Significantly, none of the decisions cited by Mr. McKay concern an investor in a Ponzi scheme who had notice of the kind of suspicious circumstances that surrounded M & L. In construing the term "good faith," as it is used in § 548(c), we find the decisions of the Eighth and Ninth Circuits and the majority of bankruptcy courts more persuasive than the authorities on which Mr. McKay relies.
 
 
 33
 Accordingly, we conclude that the bankruptcy court and the district court properly held that good faith under § 548(c) should be measured objectively and that "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." Jobin, 164 B.R. at 661 (quoting Agric. Research & Technology Group, 916 F.2d at 536).
 
 B. Evidence of a Lack of Good Faith
 
 34
 Mr. McKay also argues that, even under an objective standard, the bankruptcy and district courts erred in concluding that his receipt of the $43,500 was not "in good faith" under § 548(c). Resolution of this issue requires a determination of whether the facts satisfy the proper legal standard, a mixed question of law and fact. See Clark v. Security Pac. Business Credit, Inc. (In re Wes Dor, Inc.), 996 F.2d 237, 241 (10th Cir.1993). In these circumstances, because the question of good faith is primarily factual, we will review the findings of the bankruptcy court for clear error. See id. at 242 (applying the clearly erroneous standard to the district court's determination of value under § 548(c)); see also Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 805 (9th Cir.1994); In re Roco, 701 F.2d at 981-82.
 
 
 35
 In arguing that he received the $43,500 from M & L in good faith, Mr. McKay notes that he invested in M & L on the recommendation of Dr. Tsoucatos, a former economics professor, and that he received assurances about the financial soundness of the company from M & L's president after the first check was returned. As further indicators of good faith, Mr. McKay also points to his visit to M & L's offices, the explanations of the high rates of return provided by M & L officials, and his review of company financial statements.
 
 
 36
 Under § 548(c), Mr. McKay has the burden of establishing good faith. See Agric. Research & Technology Group, 916 F.2d at 535; In re Candor Diamond Corp., 76 B.R. at 351, 4 Collier on Bankruptcy, supra, p 548.10 at 548-129. Upon review of the record, we agree with the district court that the bankruptcy court's finding that Mr. McKay failed to establish good faith under the objective standard of § 548(c) was not clearly erroneous. The factors supporting this conclusion have been persuasively outlined by the district court: Mr. McKay's experience as an investor; promised rates of return greatly exceeding the market rate (120% per year on two investments and 468% on the two other investments); an implausible explanation by M & L officials as to how the company could pay these extremely high rates; M & L's use of postdated checks to pay investors; Dr. Tsoucatos's disclosure that he received a commission for finding investors for M & L; and the fact that the company's first check to Mr. McKay was returned. See Jobin, 164 B.R. at 662-63. In light of all of these circumstances, it was not clearly erroneous for the bankruptcy court to conclude that a reasonably prudent investor in Mr. McKay's position should have known of M & L's fraudulent intent and impending insolvency and that he was therefore not entitled to the good faith defense established by § 548(c).
 
 
 37
 C. The "Ordinary Course of Business" Defense under § 547(c)(2)
 
 
 38
 Mr. McKay also challenges the conclusion of the bankruptcy and district courts that the transfers from M & L were not made "in the ordinary course of ... business or financial affairs," 11 U.S.C. § 547(c)(2), and that, as a result, the trustee was entitled to avoid the transfers under § 547(b). On this factual question, we must accept the conclusions of the bankruptcy court unless they are clearly erroneous. Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners), 12 F.3d 1549, 1553 (10th Cir.1993), cert. denied, 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994).
 
 
 39
 Under § 547(b), the trustee may avoid transfers of property of the debtor made within ninety days of the filing of the bankruptcy petition if she proves that the transfer was made: (1) for the benefit of a creditor; (2) in satisfaction of an antecedent debt; (3) while the debtor was insolvent; and (4) such that it enabled the creditor to receive more than he would have received in a chapter 7 liquidation proceeding. 11 U.S.C. § 547(b)(1)-(5).[5] Section 547(c)(2) establishes a defense as to transfers made in the ordinary course of business:
 
 
 40
 (c) The trustee may not avoid under this section a transfer--
 
 
 41
 ...
 
 
 42
 (2) to the extent that such transfer was--
 
 
 43
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 44
 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 
 
 45
 (C) made according to ordinary business terms[.]
 
 
 46
 11 U.S.C. § 547(c)(2). The transferee has the burden of proving this defense. In re Meridith Hoffman Partners, 12 F.3d at 1553. Additionally, the defense should be narrowly construed. J.P. Fyfe, Inc. v. Bradco Supply Corp., 96 B.R. 474, 476 (D.N.J.1988), aff'd, 891 F.2d 66 (3d Cir.1989); First Software Corp. v. Curtis Mfg. Co. (In re First Software Corp.), 81 B.R. 211, 213 (Bankr.D.Mass.1988); Waldschmidt v. Ranier (In re Fulghum Constr. Corp.), 78 B.R. 146, 150 (M.D.Tenn.1987), rev'd on other grounds, 872 F.2d 739 (6th Cir.1989).
 
 
 47
 In affirming the conclusion of the bankruptcy court that Mr. McKay had failed to establish the ordinary course of business defense, the district court focused on § 547(c)(2)(C)'s requirement that the transfer be made according to ordinary business terms. See Jobin, 164 B.R. at 664-65. In applying § 547(c)(2), we have taken the same approach. See In re Meridith Hoffman Partners, 12 F.3d at 1553 ("Because we conclude that the payments were not made according to ordinary business terms, we do not discuss whether they meet the other two requirements."). Accordingly, we will address the "ordinary business terms" element of the § 547(c)(2) defense.
 
 
 48
 In In re Meridith Hoffman Partners, we concluded that "ordinary business terms" under § 547(c)(2) "are those used in 'normal financing relations,': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy." 12 F.3d at 1553. We arrived at this definition by considering the general purpose of the § 547(c)(2) defense--"to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Id. (quoting, S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), 1978 U.S.C.C.A.N. 5787, 5874).
 
 
 49
 Although several courts have concluded that transfers by a debtor engaged in a Ponzi scheme do not, as a matter of law, involve ordinary business terms, see, e.g., Henderson v. Buchanan, 985 F.2d 1021, 1025 (9th Cir.1993); In re Taubman, 160 B.R. 964, 971 (Bankr.S.D.Ohio 1993), we have chosen a middle ground. In Sender v. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.), 48 F.3d 470, 476 (10th Cir.1995), we rejected "the sweeping rule that § 547(c)(2) has absolutely no application in the context of a Ponzi scheme." Instead, we stated that because investment companies do not ordinarily pay fraudulent profits to early investors, the § 547(c)(2) defense is inapplicable to payments to investors in a Ponzi scheme. Id. However, we also noted that payments to non-investment creditors could be made according to ordinary business terms and in the ordinary course of business such that these investors are entitled to the § 547(c)(2) defense. Id. ("If, for instance, a Ponzi scheme uses telephone services, is billed for that service, and pays the phone company, disallowing the avoidance of that payment following a bankruptcy petition is consistent with the purposes of § 547.").
 
 
 50
 In the instant case, it is undisputed that Mr. McKay is an investment creditor of a Ponzi scheme. The rule we formulated in In re Hedged-Investments is directly applicable, and the bankruptcy court did not clearly err in concluding that payments from M & L to Mr. McKay were not made according to ordinary business terms under § 547(c)(2)(C). The bankruptcy court and the district court properly rejected Mr. McKay's ordinary course of business defense to the trustee's § 547 claim.
 
 
 51
 D. Reasonably Equivalent Value Under § 548(a)(2)
 
 
 52
 In her cross-appeal, the trustee argues that the bankruptcy court and the district court erred in concluding that she was not entitled to avoid the transfers from M & L to Mr. McKay under § 548(a)(2). We find no error in the analysis of the bankruptcy and district courts.
 
 
 53
 Section 548(a)(2) provides that the trustee may avoid transfers of the debtor's property made within one year of the bankruptcy petition if the debtor:
 
 
 54
 (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 
 
 55
 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
 
 
 56
 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 
 
 57
 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
 
 
 58
 11 U.S.C. § 548(a)(2). Section 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." As the district court noted, the Bankruptcy Code does not define the term "antecedent debt," but it does define "debt" as "liability on a claim." See Jobin, 164 B.R. at 666 (citing 11 U.S.C. § 101(12)). "Claim" is defined broadly as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," and as the "right to an equitable remedy for a breach of performance." 11 U.S.C. § 101(5).
 
 
 59
 Both the bankruptcy court and the district court rejected the trustee's § 548(a)(2) claim on the grounds that Mr. McKay had given "reasonably equivalent value" to M & L. According to both courts, the value given to M & L was the reduction of Mr. McKay's claim for restitution against M & L. As the bankruptcy court explained, "[I]t is not disputed that [Mr. McKay] invested the total sum of $207,500 into M & L and was only able to cash checks totaling $43,500.00. That is[,] [Mr. McKay] lost, on an out-of-pocket basis, the sum of $164,000.00 and still has a restitution right to same." Aplt.App. vol. II at 542. Thus, according to the bankruptcy and district courts, in paying $43,500 to Mr. McKay, M & L received "reasonably equivalent value" in that Mr. McKay's claim for restitution as a defrauded investor was reduced by this amount.
 
 
 60
 The courts based their reasoning on two decisions: Wyle v. Rider (In re United Energy Corp.), 944 F.2d 589, 596 (9th Cir.1991) and In re Independent Clearing House, 77 B.R. at 857. Both decisions concluded that investors in fraudulent schemes had claims for restitution and rescission against the debtor and that, by reducing the amount of these claims, the debtors' payments provided reasonably equivalent value. See In re United Energy 944 F.2d at 596 (noting that investors in a fraudulent scheme clearly had claims for rescission and restitution ... regardless of whether there existed a contractual right to the return of principal); In re Independent Clearing House, 77 B.R. at 857 ("From the time a defendant entrusted his money to the debtors, he had a claim against the debtors for the return of his money. We believe that the Code's definition of 'debt' and its related terms is broad enough to cover the debtors' obligation to return a defendant's principal undertaking, whether that obligation was based on the contract between the debtors and the defendant or was based on the defendant's right to restitution.").
 
 
 61
 In challenging the rejection of her § 548(a)(2) claim, the trustee relies on the bankruptcy court's finding that Mr. McKay lacked good faith under § 548(c). She argues that, because Mr. McKay lacked good faith, he did not have a colorable restitution claim against M & L, and, as a result, M & L's payments to him did not provide M & L with "reasonably equivalent value" by reducing such a claim. She also argues that the bankruptcy and district courts improperly applied two standards of good faith--an objective one under § 548(c) and a subjective one under § 548(a)(2). She maintains that the objective standard should be applied under both subsections and that, under this objective standard, she is entitled to avoid the transfers under § 548(a)(2).
 
 
 62
 Contrary to the trustee's argument, the language of § 548(a)(2) and § 548(c) does not require application of the same standard. Although § 548(c) uses the term "good faith," § 548(a)(2) does not. Instead, § 548(a)(2) refers to "value." Because the Bankruptcy Code's definition of "value" includes "satisfaction of an antecedent debt" and because the Code's definition of "debt" includes "liability on a claim," analysis of the trustees § 548(a)(2) claim requires us to determine whether Mr. McKay has a claim against M & L and, if so, whether M & L's payments to him reduced that claim--thereby providing "reasonably equivalent value."
 
 
 63
 In making these determinations, we apply Colorado law. See Landsing Diversified Properties-II v. First Nat'l Bank & Trust Co. (In re W. Real Estate, Inc.), 922 F.2d 592, 595 (10th Cir.1990), modified sub nom., Abel v. West, 932 F.2d 898 (1991); Flavor Dry, Inc. v. Lines (In re James E. O'Connell Co.), 799 F.2d 1258, 1260 (9th Cir.1986). Additionally, we must consider the following factual findings of the bankruptcy court regarding Mr. McKay's state of mind--which the trustee has not challenged in her cross-appeal:
 
 
 64
 This conclusion regarding objective "bad faith," (more accurately lack of good faith) should not be construed as a determination by this Court of malicious intent, malevolence, or nefarious scheming by McKay--or of a lack of credibility. The Court does not find that he was malicious, malevolent, nefarious, or not credible. He simply did not invest in M & L and receive payments from M & L in a good faith manner as measured by an objective--not subjective standard.
 
 
 65
 Aplt.App. vol. II at 547. Accordingly, the question before us is whether an individual investor who should have known of a fraudulent scheme but did not have actual knowledge has a colorable restitution claim to recover his investment.
 
 
 66
 Upon review of the applicable law, we conclude that Mr. McKay has such a claim. One who has been fraudulently induced to enter into a contract may rescind the contract and recover the benefits that he has conferred on the party who has defrauded him. See Western Cities Broadcasting v. Schueller, 849 P.2d 44, 48 (Colo.1993) (en banc); Trimble v. City & County of Denver, 697 P.2d 716, 723-24 (Colo.1985). Importantly:
 
 
 67
 A suit in equity for rescission of a contract ... does not necessarily fail because the party seeking rescission was unreasonable in relying upon the misrepresentation made by the other party. Even negligence on the part of the party seeking rescission will not bar equitable relief when the misrepresentation was made intentionally by the other party.
 
 
 68
 Pacific Maxon, Inc. v. Wilson, 96 Nev. 867, 619 P.2d 816, 817 (1980).
 
 
 69
 Colorado courts have applied this principle to allow a party fraudulently induced to enter into a contract to recover the full amounts paid even when the defrauded party acted negligently and had inquiry notice of the fraud. For example, in Enerwest, Inc. v. Dyco Petroleum Corp., 716 P.2d 1130, 1132 (Colo.App.1986), the court concluded that a company that had entered into a contract to acquire an easement was entitled to "restitution of the full amount paid under the contract" because the parties purporting to convey the easement had fraudulently concealed the fact that they had previously conveyed the easement to a third party. The court observed that the defrauded parties' right to recover restitution was unaffected by the fact that they had inquiry notice of the prior conveyance. Id.; see also Loden v. Drake, 881 P.2d 467, 469 (Colo.App.1994) (noting that a party's failure to read certain provisions of a contract does not preclude restitution if the other party fraudulently concealed other contractual terms).
 
 
 70
 In this case, the evidence in the record indicates that Mr. McKay was fraudulently induced to invest in M & L. As a result, in light of the bankruptcy court's factual finding that he did not have actual knowledge of the fraud, Mr. McKay has a colorable claim to recover the amounts that he invested in M & L. The bankruptcy and district courts thus properly concluded that M & L's payments to Mr. McKay reduced the amount of this restitution claim, that M & L thereby received reasonably equivalent value for its payments to him, and that the trustee was not entitled to avoid the transfers under § 548(a)(2).[6]
 
 III. CONCLUSION
 
 71
 For the reasons set forth above, we therefore AFFIRM the decision of the district court in all respects.
 
 
 
 *
 The late Honorable Oliver Seth, Senior Judge, United States Court of Appeals for the Tenth Circuit, heard oral argument in this case but did not participate in the final decision
 
 
 [1]
 We have defined a Ponzi scheme as
 an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.
 Sender v. Heggland Family Trust (In re Hedged-Invs. Assocs., Inc.), 48 F.3d 470, 471 n. 2 (10th Cir.1995) (citing Merrill v. Abbott (In re Ind. Clearing House Co.), 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984), aff'd in part and rev'd in part, 62 B.R. 118 (D.Utah 1986)).
 
 
 [2]
 As to the other $21,500 in payments from M & L, the court observed that, after he received them, Mr. McKay invested an additional $100,000 (i.e. the two $50,000 investments that he made in September 1990). Noting that, under 11 U.S.C. § 547(c)(4), the "new value" exception, the trustee may not avoid an otherwise preferential transfer if the transferee gives "new value" to the debtor after the transfer, the court ruled that the trustee could not recover the first four payments from M & L (totaling $ 21,500) under § 547. The trustee did not challenge this conclusion regarding the § 547(c)(4) exception in the appeal to the district court, and she has not done so in this appeal. However, because of our ultimate conclusion that the trustee may recover the entire $43,500 (including the $21,500 covered by the "new value" exception) under § 548(a)(1), the applicability of the exception is of little practical benefit to Mr. McKay
 
 
 [3]
 11 U.S.C. § 548(a)(2) states that the trustee may avoid transfers made within a year of the filing of the bankruptcy petition if she establishes that the debtor:
 (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (B)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
 
 
 [4]
 Although the question before the Ninth Circuit was the proper interpretation of "good faith" under a section of Hawaii's Fraudulent Conveyance Act, Haw.Rev.Stat. § 651C-8(d), the court referred to 11 U.S.C. § 548(c) as "the equivalent" of the Hawaii statute. See In re Agric. Research & Technology Group, 916 F.2d at 535. Moreover, in adopting the objective standard for determining good faith, the Ninth Circuit relied on bankruptcy court decisions construing § 548(c). See id. at 535-36 (citing McColley v. Rosenberg (In re Candor Diamond Corp.), 76 B.R. 342, 351 (Bankr.S.D.N.Y.1987); Consumers Credit Union v. Widett (In re Health Gourmet, Inc.), 29 B.R. 673, 677 (Bankr.D.Mass.1983); Sanitary Ice Vending Co., Inc. v. Harris (In re Polar Chips Int'l, Inc.), 18 B.R. 480, 484 (Bankr.S.D.Fla.1982))
 
 
 [5]
 Under § 547(b), the trustee may also avoid transfers made within a year of the filing of the bankruptcy petition if she also establishes that the transferee was an "insider." See 11 U.S.C. § 547(b)(4)(B)
 
 
 [6]
 In her cross-appeal, the trustee has also argued that the fact that Mr. McKay filed a proof of claim in the bankruptcy court for the entire amount that he invested in M & L ($212,500.00) and the fact that he did not state that this claim was for restitution establish that he does not have a restitution claim against M & L. We agree with the district court that this argument is not persuasive. "[T]he issue is not what McKay stated that M & L owed him but, whether, at the time he made his investments, he had a right to restitution." Jobin, 164 B.R. at 668. Moreover, Mr. McKay has filed an amended proof of claim for $164,000--the sum of his investments in M & L minus the payments that he received. See id. at 668 n. 6